## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ABLA ABDEL BASET YOUSSEF, | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| V. | ) | CIVIL ACTION NO: 1:17-cv-02638 |
| | ) | |
| | ) | |
| THE EMBASSY OF THE UNITED ARAB EMIRATES | ) | |
| | ) | |
| And | ) | |
| | ) | |
| THE UNITED ARAB EMIRATES, | ) | |
| | ) | |
| DEFENDANTS. | ) | |

## MEMORANDUM OF LAW
## IN SUPPORT OF SPECIALLY-APPEARING
## DEFENDANTS THE EMBASSY OF THE UNITED ARAB EMIRATES AND
## THE UNITED ARAB EMIRATES' MOTION TO DISMISS AND
## MOTION TO STRIKE DEMAND FOR A JURY TRIAL

Scott M. Flicker (DC Bar No. 425825)
Igor V. Timofeyev (DC Bar No. 998291)
Kenneth M. Willner (DC Bar No. 415906)
PAUL HASTINGS LLP
875 15th Street, N.W.
Washington, D.C. 20005
Telephone: (202) 551-1792
Facsimile: (202) 551-1705
scottflicker@paulhastings.com
igortimofeyev@paulhastings.com
kenwillner@paulhastings.com

*Counsel for the Specially Appearing Defendants the
United Arab Emirates and
the Embassy of the United Arab Emirates*

September 24, 2018

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ..................................................................................... 1

II.  FACTUAL BACKGROUND ................................................................... 2

    A.   The Cultural Division's Diplomatic Mission Is to Educate Young Emiratis in the United States in Order to Promote Progress and Development Within the UAE .................................................................... 2

    B.   The Cultural Division Consists of Four Separate and Distinct Offices, Each with a Specific Mission and Function ........................................... 4

    C.   Plaintiff Was the Employees Affairs (Personnel) Officer Within the Academic Office of the Cultural Division ............................................. 5

    D.   Plaintiff Was a Term Contract Employee, and Her Tenure with the Cultural Division Was Renewed One Year at a Time ........................... 6

    E.   The Cultural Division Faced Budget Cuts in 2013, and Was Therefore Forced to Downsize in Order to Continue Meeting Its Obligation to UAE Students Across the United States ....................................................... 7

    F.   Plaintiff Asserted a Charge of Unlawful Age Discrimination Against the Cultural Division—the UAE's Diplomatic Office ............................... 8

III. ARGUMENT ............................................................................................. 9

    A.   The UAE Is Immune from Suit Under the Foreign Sovereign Immunities Act ............................................................................................................ 9

        1.   Plaintiff's Action Is Not "Based Upon" the Cultural Division's Engagement in "Commercial Activity" as Contemplated in the FSIA ................................................................................................ 10

        2.   Even If Plaintiff's Action Is Based Upon Her Employment Relationship, It Was Not a Commercial Activity Within the Meaning of the FSIA ................................................................. 13

    B.   Even If the UAE Is Not Protected by Sovereign Immunity, the Case Must Proceed Without a Jury, and this Court Should Therefore Strike the Jury Trial Demand ................................................................................... 17

    C.   Plaintiff's DCHRA Claim Is Precluded by the Federal Enclave Doctrine .......... 18

IV.  CONCLUSION ......................................................................................... 19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Argentine Republic v. Amerada Hess Shipping Corp.*,
  488 U.S. 428 (1989)..................................................................................................9

*Dahman v. Embassy of Qatar*,
  No. 17-2628 (JEB), 2018 U.S. Dist. LEXIS 124759 (D.D.C. July 26, 2018) ..................11, 14

*De Sousa v. Embassy of Angola*,
  229 F. Supp. 3d 23 (D.D.C. 2017) ...........................................................................9

*EEOC v. St. Francis Xavier Parochial Sch.*,
  117 F.3d 621 (D.C. Cir. 1997) ..................................................................................3

*El-Hadad v. Embassy of the U.A.E.*,
  69 F. Supp. 2d 69 (D.D.C. 1999) ............................................................................17

*El-Hadad v. U.A.E.*,
  216 F.3d 29 (D.C. Cir. 2000) ...................................................................................15

*El-Hadad v. United Arab Emirates*,
  496 F.3d 658 (D.C. Cir. 2007) ......................................................................11, 13, 14, 15, 16

*Gullaksen v. United Air Lines*,
  68 F. Supp. 3d 66 (D.D.C. 2014) ..............................................................................6

*Kato v. Ishihara*,
  360 F.3d 106 (2d Cir. 2004)................................................................................11, 12

*Paul v. United States*,
  371 U.S. 245 (1963)................................................................................................18

*Pharm. Research & Mfrs. of Am. v. Dep't of Health & Human Servs.*,
  43 F. Supp. 3d 28 (D.D.C. 2014) ..............................................................................3

*Republic of Argentina v. Weltover, Inc.*,
  504 U.S. 607 (1992)..........................................................................................10, 12

*Saudi Arabia v. Nelson*,
  507 U.S. 349 (1992)........................................................................................10, 12,17

*Transaero, Inc. v. La Fuerza Aerea Boliviana*,
  30 F.3d 148 (D.C. Cir. 1994) ....................................................................................1

## TABLE OF AUTHORITIES

(continued)

**Page(s)**

*Verlinden B. V. v. Central Bank of Nigeria*,
   461 U.S. 480 (1983).........................................................................................9

**Constitutional and Statutory Provisions**

U.S. Const. art. I, § 8, cl. 17.........................................................................18

28 U.S.C.
   § 1330.................................................................................................17
   § 1603(a).................................................................................................9
   § 1603(d)...........................................................................................10, 16
   § 1604.................................................................................................9
   § 1605(a)(2).................................................................................................9
   § 1608(a).................................................................................................8

Age Discrimination in Employment Act of 1967 ("ADEA")....................................8, 9

District of Columbia Human Rights Act ("DCHRA") .......................................8, 18,19

Foreign Sovereign Immunity Act of 1976 ("FSIA") .......................................... *passim*

**Other Authorities**

H.R. Rep. No. 94-1487 (1976)...........................................................................14

## INDEX OF EXHIBITS

| Exhibit | Document Description | Page(s) |
|---|---|---|
| A | Embassy of the United Arab Emirates, Cultural Division, *About Us: Cultural Division Mission*, http://www.uaecd.org/cultural-division-mission | 2, 3,12 |
| B | Embassy of the United Arab Emirates, Cultural Division, *Sponsors: Ministry of Higher Education and Scientific Research (MOHESR)*, http://www.uaecd.org/ministry-higher-education-and-scientific-research-mohesr | 3 |
| C | Embassy of the United Arab Emirates, Cultural Division, *About Us: Cultural Division Offices*, http://www.uaecd.org/cultural-division-offices (last visited Sept. 24, 2018) | 4 |
| D | 2001 Employment Agreement | 6, 16 |
| E | 2011 Employment Agreement | 6, 16 |
| F | U.S. Dep't of State, *Visas for Diplomats and Foreign Government Officials,* https://travel.state.gov/content/travel/en/us-visas/other-visa-categories/visas-diplomats.html | 6, 16 |
| G | U.S. Dep't of State, *International Chancery Center: History of the International Chancery Center (ICC)*, https://www.state.gov/ofm/property/icc/index.htm | 18 |

I.     <u>INTRODUCTION</u>

The specially-appearing Defendants, the Embassy of the United Arab Emirates ("the Embassy") and the United Arab Emirates (together, "the UAE"), respectfully move to dismiss each and every cause of action alleged in Plaintiff Abla Abdel Baset Youssef's ("Plaintiff's") Complaint filed on December 8, 2017.[1]  *See* ECF No. 1.  The UAE is a foreign state and therefore is protected by sovereign immunity from civil suit.  Furthermore, because the Embassy is an "integral part of a foreign state's political structure," *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 151-53 (D.C. Cir. 1994), it must also be treated as foreign state under the Foreign Sovereign Immunities Act ("FSIA") and accordingly afforded sovereign immunity from suit.

Plaintiff in this case is a former local employee of the Embassy's Cultural Division, where she served as an Employees Affairs (Personnel) Officer until January 2016.  The local employees engaged by the Cultural Division (and the UAE Embassy overall) are diverse in terms of age, nationality, and gender, and neither the Cultural Division nor the Embassy discriminates on any unlawful basis in the process of hiring or retaining its local employees.  While working for the Cultural Division, Plaintiff was directly involved in the Division's day-to-day operations.  The Division's overall mission is cultural diplomacy, and specifically the placement of Emirati students at institutions of higher learning in the United States, with the ultimate aim of fostering social progress and development in the UAE.  Plaintiff served as an official representative of the Cultural Division and, consequently, was an official representative of the UAE.  Plaintiff worked closely with the Cultural Division's Cultural Attaché—the diplomatic officer overseeing the

---

[1] The UAE is making a special appearance in this case solely for the purpose of moving to dismiss the action.  The UAE does not waive service or immunity under the Foreign Sovereign Immunity Act of 1976 ("the FSIA"), Pub. L. 94-583, 90 Stat. 2891, and reserves and maintains all rights afforded to it as a sovereign state.

Cultural Division's operations and promoting its mission.  Her role was necessary to the Division's ability to effectively accomplish its governmental mission.

Setting aside the fact that Plaintiff's underlying allegations of age discrimination are meritless, this action should be dismissed for several reasons.  First, the action is barred by the doctrine of sovereign immunity.  Neither Plaintiff's role at the Cultural Division, nor the Division's function, is based upon any commercial activity that could pierce the veil of sovereign immunity.  The Cultural Division's underlying diplomatic mission is to foster education of the young UAE citizens and to promote progress and development of the UAE's society, and the Division's operations are aimed at accomplishing that mission.  Plaintiff's role at the Cultural Division was to aid the Cultural Attaché in achieving this goal.  In doing so, Plaintiff was not engaged in any kind of commercial activity.

Second, in addition to the UAE's immunity from suit, Plaintiff's District of Columbia law-based claim is also barred because at all relevant times, her workplace was located in a federal enclave separate and distinct from the District's territory.

Third, to the extent this Court does not dismiss Plaintiff's Complaint with prejudice, the Court's should strike Plaintiff's demand for a jury trial as expressly foreclosed by the FSIA.

II.   <u>FACTUAL BACKGROUND</u>

    **A.**   **The Cultural Division's Diplomatic Mission Is to Educate Young Emiratis in the United States in Order to Promote Progress and Development Within the UAE**

The Cultural Division is a governmental entity within the UAE Embassy, directly responsible to the UAE Ministry of Higher Education & Scientific Research (MOHESR).  The Cultural Division oversees and administers several scholarship programs for Emirati students seeking education at U.S. universities.  *See* Embassy of the United Arab Emirates, Cultural Division, *About Us: Cultural Division Mission*, http://www.uaecd.org/cultural-division-mission,

attached as Ex. A.[2]  The purpose of the Embassy's Cultural Division is to provide Emirati students access to education so that they may contribute in accomplishing the UAE's dual goals of progress and development.  *Id.*  Specifically, the Cultural Division is dedicated to promoting an educational exchange between the United Arab Emirates and the United States in order to foster social, political, and economic development within the UAE and to enhance the country's quality of life.  *See* Embassy of the United Arab Emirates, Cultural Division, *Sponsors: Ministry of Higher Education and Scientific Research (MOHESR)*, http://www.uaecd.org/ministry-higher-education-and-scientific-research-mohesr, attached as Ex. B.

Plaintiff does not allege that the Cultural Division is engaged in any kind of commercial activity.  The Division does not offer or sell any products or services, either within the United States or to Emirati citizens.  The Division's function is purely public, and its cultural diplomacy mission is to promote educational exchange and to place UAE scholars with American colleges and universities.  The Cultural Division guides Emirati students in the process of university enrollment and registration procedures, and assists students with finding appropriate accommodations while they stay in the United States.  *See* Ex. A.

The Cultural Division's entire operation is overseen and administered by the Cultural Attaché of the Embassy of the United Arab Emirates.  The Cultural Attaché is an official representative of the United Arab Emirates and enjoys diplomatic immunity.  The Cultural Attaché ensures the Cultural Division meets its overarching goal of ensuring the UAE has a well-educated citizenry necessary for the country's prosperity.  This task includes ensuring the proper level of staffing and funding for the Cultural Division.  The Cultural Attaché also ensures that

---

[2] In ruling on a Rule 12(b)(6) motion to dismiss, a court may consider not only the facts alleged in the complaint, but also "any documents either attached to or incorporated in the complaint[,] and matters of which . . . judicial notice" may be taken.  *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997).  Information publicly available on a government website is proper material for judicial notice.  *Pharm. Research & Mfrs. of Am. v. Dep't of Health & Human Servs.*, 43 F. Supp. 3d 28, 33 (D.D.C. 2014).

the UAE students enrolled in U.S. universities successfully navigate their academic careers and

are able to overcome the many hurdles young adults face while enrolled in these institutions.

**B.    The Cultural Division Consists of Four Separate and Distinct Offices, Each with a Specific Mission and Function**

The Cultural Division is a relatively small entity with a current estimated total of 20

employees, including the Cultural Attaché herself.  The Cultural Division consists of four

offices:

- **Academic Office:** This office implements UAE national educational and training policies to provide the country with qualified, talented individuals in support of achieving the country's goals of progress and development.  Through its staff of professional educators, the Office strives to advance the higher education plans and strategies of the UAE by placing its scholars in high-quality programs and preparing them for the market needs of the country.

- **Admissions & Placement Office:** This office fulfills the responsibilities of seeking placement in ESL programs and securing academic admissions to higher education institutions for UAE students.

- **Accreditation and Authentication Office:** The Accreditation & Authentication Office educates and conveys to the MOHESR, UAE nationals, and other UAE sponsors the critical importance of enrollment in fully accredited U.S. higher education institutions and accredited academic programs.

- **Accounting Office:** The Accounting Office is responsible for the timely and accurate processing of all invoices and reimbursements relating to a student's scholarship award.  This task includes all appropriate medical, tuition, and allowance payments permitted by law under his/her scholarship decree.  In addition to processing payments and refunds, this office is also responsible for the preparation of monthly financial reports sent to all appropriate funding agencies.

*See* Embassy of the United Arab Emirates, Cultural Division, *About Us: Cultural Division Offices*, http://www.uaecd.org/cultural-division-offices (last visited Sept. 24, 2018), attached as

Ex. C.  Although the offices work collaboratively, for the most part each office is tasked with a

unique function and there is no real overlap among the offices' work streams.  In fact, each of the

above offices is physically separated from the others.  As a result, ministerial and clerical

employees, such as accountants, do not interact with employees who are tasked with

implementing the Cultural Division's primary goal of assisting Emirati students in enrolling and pursuing their studies in the U.S. institutions of higher education, which is performed mainly by the Academic Office.  While the Cultural Attaché oversees all four offices, her duties fall primarily within the Academic Office.

### C.   Plaintiff Was the Employees Affairs (Personnel) Officer Within the Academic Office of the Cultural Division

Plaintiff served as the Employees Affairs (Personnel) Officer at the Cultural Division from 2001 until January 2016.  Compl. ¶ 12.  Plaintiff's position was in the Academic Office, and she reported directly to the Cultural Attaché.  Compl. ¶ 14.  Plaintiff's duties involved not only assisting the Cultural Attaché in the performance of her academic duties, but also managing a number of workplace issues to ensure that the Division was capable of performing its function. *See generally* Compl. ¶¶ 14-15.  Although her duties included keeping track of employee overtime, sick leave, and paid time off, Plaintiff also provided the Cultural Attaché with direct support in her mission of assisting Emirati citizens in obtaining an education in the United States. *See id.*  Plaintiff served as the first-level reviewer for academic matters that were intended for the Cultural Attaché's final review and approval.  Thus, Plaintiff was the first reviewer of scholarship applications before forwarding them to the Cultural Attaché.  Those that she found insufficient were not forwarded and therefore were not approved.  In this way, Plaintiff directly supported, and was directly engaged in, the Cultural Attaché's diplomatic activities of promoting and maintaining educational exchange opportunities for Emirati students in the United States. *See generally id.*

Plaintiff enjoyed employment benefits common to other Embassy employees, including time off not only during holidays observed in the United States, but also those observed in the

UAE.  *See* Ex. D (2001 Employment Agreement); Ex. E (2011 Employment Agreement).[3]

Moreover, Plaintiff is an Egyptian national, and for the entirety of her tenure with the Cultural

Division she was only allowed to work in the United States because of an A-2 work visa

obtained by the Embassy.  *See* Compl. ¶¶ 11-13; *see also* U.S. Dep't of State, *Visas for*

*Diplomats and Foreign Government Officials*, https://travel.state.gov/content/travel/en/us-

visas/other-visa-categories/visas-diplomats.html (last visited Sept. 24, 2018), attached as Ex. F.

> **D.**   **Plaintiff Was a Term Contract Employee, and Her Tenure with the Cultural**
> **Division Was Renewed One Year at a Time**

Plaintiff's employment relationship with the Embassy's Cultural Division began in 1998.

Compl. ¶ 12.  During Plaintiff's tenure, the Cultural Division was based within the UAE

Embassy's current location at 3522 International Court NW, Washington, DC 20008.[4]  As with

all administrative staff hired to directly support the Cultural Division's diplomatic mission, the

Embassy employed Plaintiff under a one-year contract subject to renewal.  *See* Compl. ¶¶ 17-18.

Thus, virtually every year Plaintiff was employed by the Cultural Division, she signed an

Employment Agreement ("Agreement") describing the at-will nature of her employment and

clarifying that the term of her employment was limited to one year.  *See* Ex. D; Ex. E.

Plaintiff's Employment Agreement provided that during the course of Plaintiff's

employment, she would "be sent on official duty to the Ministry Head Office on the Ministry's

cost and expense in accordance with the applied financial regulations," and that she may be

required to be "sent on official duty outside the country" in an official capacity on behalf of the

Cultural Division.  Ex. D art. 14(b); Ex. E art. 15.  Thus, Plaintiff not only served as the

---

[3] Plaintiff expressly refers to the 2011 Employment Agreement in her Complaint.  *See* Compl. ¶ 17.  Plaintiff also expressly discusses to her employment as the Employees Affairs (Personnel) Officer of the Cultural Division since 2001.  *See, e.g.*, Compl. ¶¶ 12, 14.  Therefore, this Court can consider both employment agreements because they are either "referred to in the complaint" or "integral to a claim*." Gullaksen v. United Air Lines*, 68 F. Supp. 3d 66, 70 (D.D.C. 2014) (citing cases).
[4] The Cultural Division has since moved to 2406 Massachusetts Ave. NW, Washington, DC 20008.

immediate support personnel for the Cultural Attaché, but also made substantial decisions about scholarship applicants, and was authorized to be sent on official duties abroad to represent both the Cultural Division and the UAE at large.

      **E.**      **The Cultural Division Faced Budget Cuts in 2013, and Was Therefore Forced to Downsize in Order to Continue Meeting Its Obligation to UAE Students Across the United States**

When Plaintiff began working for the Cultural Division, there were approximately 33 employees devoted to the Division's mission of promoting progress and development. Compl. ¶ 14. Since 2013, the total number of the Embassy's Cultural Division staff has been downsized by nearly one-third. *See* Compl. ¶ 30. This downsizing was caused by the decrease in funding the Cultural Division receives from the MOHESR following the collapse of oil prices and the increased allocation of scholarships to Emirati students pursuing their education in other countries. Despite the fact that Plaintiff's position was marked for downsizing and that she turned 65 years old in 2014, the Embassy continued to renew Plaintiff's one-year contract in December 2013 (for the calendar year 2014) and December 2014 (for the calendar year 2015). *See* Compl. ¶¶ 20-21. At the end of 2015, after facing further funding reductions from the MOHESR, the Embassy's Cultural Division identified Plaintiff's position for termination in the coming year and gave her 30 days' notice that her contract would not be renewed. *See* Compl. ¶ 23. The Embassy did not terminate or cancel Plaintiff's one-year employment contract before it expired. *See id.* The Embassy also did not terminate Plaintiff's work visa at that time.

Plaintiff requested an extension after she was given notice that her contract would not be renewed for 2016. *See* Compl. ¶ 32. In response to Plaintiff's request, the Cultural Division obtained approval from the MOHESR for a four-month extension and communicated that extension to Plaintiff on January 3, 2016. *See generally id.* Plaintiff rejected this offer and chose

not to return to work.[5]  Even though it was faced with budget cuts, the Cultural Division then

obtained approval from the MOHESR for a full one-year renewal of Plaintiff's contract and

extended the offer to her in a letter dated March 31, 2016.  Consistent with the prior renewals of

her one-year contract, the offer would continue to provide Plaintiff with employment benefits,

including her insurance coverage and visa status.  Plaintiff rejected that offer as well.

### F. Plaintiff Asserted a Charge of Unlawful Age Discrimination Against the Cultural Division—the UAE's Diplomatic Office

On December 8, 2017, Plaintiff filed the instant action against the UAE.  *See* ECF No. 1.

Plaintiff alleged that she suffered discrimination based on her age, in violation of the Age

Discrimination in Employment Act of 1967 ("ADEA") and the District of Columbia Human

Rights Act ("DCHRA"), when her employment with the Embassy came to an end in January

2016 after she chose not to return to work.  Compl. ¶ 1.  On December 11, 2017, this Court

issued a summons to the UAE based on Plaintiff's complaint.  *See* ECF No. 2.

To effectuate service of process, Plaintiff was required to serve the UAE and the

Embassy pursuant to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1608(a).

Plaintiff did not commence the service process until February 1, 2018, nearly two months after

filing her Complaint.  *See* ECF No. 4.  As this Court recognized, "Plaintiff's attempt to serve

process on the Embassy in February of 2018 failed to satisfy the requirements of 28 U.S.C.

§ 1608(a), given that the Embassy is a 'foreign state.'"  *See* Minute Order (June 8, 2018) (citing

*Howe v. Embassy of Italy*, 68 F. Supp. 3d 26, 33 (D.D.C. 2014)).  Plaintiff did not effectively

serve the UAE and the Embassy until April 22, 2018.

---

[5] Plaintiff omits this fact (and several other facts related to her departure) from the Complaint.  The UAE provides an accurate factual background in this motion.  If the Court does not grant this motion to dismiss, the UAE will be able to substantiate these facts with competent evidence.

III.   <u>ARGUMENT</u>

A.   **The UAE Is Immune from Suit Under the Foreign Sovereign Immunities Act**

The FSIA is the "sole basis for obtaining jurisdiction over a foreign state" in the United

States.  *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989).[6]  Under

the FSIA, foreign states "shall be immune from the jurisdiction of the courts of the United

States" unless one of a limited number of enumerated exceptions applies.  28 U.S.C. § 1604.

Only when a specific exception applies does a federal court have subject matter jurisdiction over

a foreign state.  *See Verlinden B. V. v. Central Bank of Nigeria*, 461 U.S. 480, 488-89 (1983).

Plaintiff asserts that this Court has jurisdiction over the UAE because of the commercial

activity exception, 28 U.S.C. § 1605(a)(2).  The commercial activity exception provides for three

instances in which a foreign state is not immune from suit in U.S. courts: when the action is

"based upon" (i) "a commercial activity carried on in the United States by a foreign state;" (ii)

"an act performed in the United States in connection with commercial activity of the foreign

state elsewhere;" or (iii) "an act outside the territory of the United States in connection with a

commercial activity of the foreign state elsewhere and that act causes a direct effect in the United

States."  28 U.S.C. § 1605(a)(2).

Plaintiff's assertion is incorrect.  The instant action arises out of a uniquely

governmental, not commercial, function: the promotion of educational exchange between

nations.  Indeed, the United States Department of State (and U.S. embassies) performs the same

function in other countries.  Thus, the alleged discrimination against an employee directly

involved in the Cultural Division's diplomatic mission, in alleged violation of the Age

---

[6] The United Arab Emirates is unquestionably a foreign state.  Additionally, the Embassy of the United Arab
Emirates is also considered a foreign state for purposes of the FSIA.  *See* 28 U.S.C. 1603(a) (defining a foreign state
to include "a political subdivision of a foreign state or an agency or instrumentality of a foreign state"); *see also De
Sousa v. Embassy of Republic of Angola*, 229 F. Supp. 3d 23, 26 (D.D.C. 2017).

Discrimination in Employment Act and the District of Columbia Human Rights Act, is not "based upon" commercial activity as contemplated in the FSIA, nor is Plaintiff's "employment" a commercial activity.  Plaintiff's role and effective responsibilities at the Cultural Division included exercises of discretion that renders her employment akin to that of a civil servant and not a "commercial activity."

1.      <strong>Plaintiff's Action Is Not "Based Upon" the Cultural Division's Engagement in "Commercial Activity" as Contemplated in the FSIA</strong>

For there to be jurisdiction over a foreign state based on the commercial activity exception, the cause of action must be "'based upon' some 'commercial activity'" by the foreign state.  *See Saudi Arabia v. Nelson*, 507 U.S. 349, 356 (1993).  The analysis therefore begins with determining on what the action is "based."  *Id.  Nelson* concludes that "based upon" invokes "those elements of a claim that, if proven, would entitle a plaintiff to relief under his theory of the case."  *Id.* at 357.

The analysis then turns to what constitutes "commercial activity."  The statutory language directs that "commercial activity" means "either a regular course of commercial conduct or a particular commercial transaction or act."  28 U.S.C. § 1603(d).  The language also instructs that the commercial character "be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose."  *Id.*  A foreign state engages in commercial activity when it acts as a private player within the market, such that it exercises powers that can also be exercised by private citizens, as opposed to powers that are "peculiar to sovereigns."  *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614 (1992) (quoting *Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 704 (1976)).  Actions that may fall within the scope of "commercial activity" are evaluated based on the actual behavior, rather than motivation.  *Nelson*, 507 U.S. at 360 (citing *Weltover*, 504 U.S. at 614).

Plaintiff asserts that she "was not employed as a government civil servant employee," and that her actions were "neither governmental, nor diplomatic or political in nature," and furthermore, that she was "hired as a third country local employee." These allegations are insufficient to bring this case within the "commercial activity" exception.

The main Circuit precedent on the application of the commercial activity exception to foreign embassies' employees is *El-Hadad v. United Arab Emirates*, 496 F.3d 658, 664-65 (D.C. Cir. 2007). There, the D.C. Circuit set forth "a two-step test to determine whether a foreign state has engaged in commercial activity with respect to the plaintiff's employment." *Dahman v. Embassy of Qatar*, No. 17-2628 (JEB), 2018 U.S. Dist. LEXIS 124759 at *12 (D.D.C. July 26, 2018). The test, however, only applies when the action is "based upon" the plaintiff's employment relationship and it is necessary to determine whether or not the employment of the plaintiff constitutes "commercial activity," which is plainly not the case here.

In the instant case, the action is not based upon the contours of the employment relationship between Plaintiff and the UAE. Indeed, Plaintiff's employment contract expressly provided for the expiration of her employment at the end of the year, and thus the contract provides no basis for a claim opposing the end of her employment then. Plaintiff's contractual employment relationship therefore is not the basis for the claim.

The Second Circuit's decision in *Kato v. Ishihara*, 360 F.3d 106 (2d Cir. 2004), is instructive here. In *Kato*, an employee alleged she was a victim of sexual harassment and sued her employer, the Tokyo Metropolitan Government. *Id.* at 107. In evaluating the application of the FSIA, the Second Circuit looked to identify "commercial activity" based on whether the Tokyo Metropolitan Government's activities, not those of the plaintiff, "were typical of a private party engaged in commerce." *Id.* at 111. Since the Tokyo Metropolitan Government's role in

-11-

New York was to be "engaged in the *promotion of commerce*" rather than engaged in commerce itself, the Second Circuit determined such a function to be "a basic-even quintessential-governmental function."  *Id.* at 112 (emphasis in original).  The Second Circuit compared the Tokyo Metropolitan Government's functions to those of several United States government agencies.

The United Arab Emirates Cultural Division, a division of the Ministry of Higher Education, is also engaged in the quintessential government function of promoting educational opportunities in the United States for UAE students.  This organization's function is akin to that of a government program in the United States: USA Study Abroad, a division of the U.S. Department of State.  The Department of State supports USA Study Abroad as a way to support American students who wish to gain global knowledge and skills.  Similarly, the UAE Cultural Division is designed to support a "high-spirited educational exchange" between the UAE and the United States.  Ex. A at 1.  Both USA Study Abroad and the Cultural Division assist in scholarship pairings for students seeking to study abroad.  *See generally* Ex. A.  While individual, private institutions may support their students studying abroad, the widespread support of a country's nationals studying in foreign jurisdictions to gain skills and understanding is a "quintessential-governmental function." *Kato*, 360 F.3d at 112.  A finding that the Cultural Division's activities are "commercial" and its employees unprotected by sovereign immunity would invite other nations to find U.S. State Department USA Study Abroad employees likewise to be unprotected in other countries.

A *foreign state* engages in commercial activity when "it exercises 'only those powers that can also be exercised by private citizens' as distinct from those 'powers peculiar to sovereigns.'" *Nelson*, 507 U.S. at 360 (quoting *Weltover*, 504 U.S. at 614).  The promotion of a country's

nationals in their educational pursuits abroad is peculiar to sovereign nations, and thus is not a commercial activity upon which Plaintiff's claim can be based.

> ### 2. Even If Plaintiff's Action Is Based Upon Her Employment Relationship, It Was Not a Commercial Activity Within the Meaning of the FSIA

As discussed, Plaintiff alleges that she was not employed as a civil servant, that her actions were not governmental, and that she was hired as a third-country local employee. As the D.C. Circuit held in *El-Hadad*, while "employment of civil servants is noncommercial for the purposes of the FSIA," employment of third-country employees who are not civil servants can nevertheless be outside the commercial activity exception, depending on the nature of their employment duties. The D.C. Circuit laid out five factors to be considered to determine whether or not the plaintiff was a member of the civil service:

> First, how do the U.A.E.'s own laws define its civil service, and do El-Hadad's job title and duties come within that definition? Second, what was the nature of El-Hadad's employment relationship with the U.A.E.? . . . Third, what was the nature of El-Hadad's employment relationship when he worked in the U.A.E., and how did his subsequent employment at the Embassy relate to that prior tenure? . . . Fourth, what was the nature of El-Hadad's work? . . . Fifth, what is the relevance of El-Hadad's Egyptian nationality on the facts of this case?

*El-Hadad*, 496 F.3d at 665 (internal quotation marks and citation omitted).

In *El-Hadad*, the application of these factors led the D.C. Circuit to conclude that the commercial exception applied, although the court emphasized that the question was "exceedingly close." *Id.* Here, by contrast, the application of these factors demonstrates that Plaintiff's employment was outside the exception's scope. First, whereas El-Hadad was issued a letter stating that he did not have civil servant benefits, Plaintiff's complaint contains no such allegation. On the contrary, Plaintiff's employment contract provided her with 60 days of vacation and sick leave and end-of-service benefits commensurate with her years of employment. She was afforded the same benefits as the Cultural Division's advisors charged

with disseminating scholarships and advising UAE students.  Plaintiff's benefits demonstrate that the first factor leans against a finding of commercial exception, unlike in *El-Hadad*, where the employee "lacked benefits common to other U.A.E. government employees."  *El-Hadad*, 496 F.3d at 666.

The second inquiry evaluates whether Plaintiff's employment was a "true contractual arrangement" or if the claim is based on civil service laws of the UAE.  Plaintiff did have an employment contract with the Cultural Division for a one-year term, which provided the option for renewal.  This claim, however, is not based on the contractual arrangement, unlike the breach of contract claim that formed the basis of the *El-Hadad* litigation.  There is no breach of contract claim in this case.  There is no requirement in Plaintiff's contract that it be renewed, and the renewal of her contract was at the discretion of the Cultural Attaché.  Thus, this second inquiry does not weigh in favor of finding the commercial exception.

The third factor does not apply here.  Plaintiff had no preexisting relationship with the UAE prior to joining in 1999.

The fourth factor, the nature of Plaintiff's work, tilts in favor of Plaintiff's employment being akin to a civil service assignment.  As the Employees Affairs Officer, Plaintiff tracked and maintained records for all personnel within the Cultural Division.  While simply handling a large amount of government information may not be considered to be government work (*Dahman*, 2018 U.S. Dist. LEXIS 124759 at *15-16), Plaintiff's responsibilities were qualitatively different than those of a member of "clerical staff" (for which Congressional records indicate their employment disputes would not be immune from suit under the FSIA).  H.R. Rep. No. 94-1487 (1976), at 16.  Rather, Plaintiff was responsible for screening and transmitting to the Cultural Attaché information without which decisions could not be made.  For example, scholarship

applicants whose application she did not forward did not receive scholarships. Her actions directly affected the ability of the Cultural Division to function through the distribution of scholarships and advisement of students. Unlike the employee in *El-Hadad*, who "performed only the ordinary duties of any commercial accountant," 496 F.3d at 666, Plaintiff's role of screening and providing information to the Cultural Attaché with the ability to influence policy decisions went far beyond the scope of an ordinary human resources personnel officer, let alone a commercial accountant. The nature of Plaintiff's work was discretionary and governmental in nature, and therefore points towards immunity from suit under the FSIA.

Finally, as to the fifth factor, the D.C. Circuit clarified that there is no "per se" rule that a foreign national could not be a member of a country's civil service; rather, "the relevance of a plaintiff's nationality for the civil service inquiry becomes a matter of context." *El-Hadad*, 496 F.3d at 667. As the D.C. Circuit observed, a "per se rule of non-immunity for a foreign state's employment of third country nationals" would be inconsistent with congressional intent in codifying the FSIA. *El-Hadad v. U.A.E.*, 216 F.3d 29, 33 (D.C. Cir. 2000). Emphasizing that smaller countries—such as the UAE— may hire non-nationals in "high governmental positions," the court concluded that the fact that El-Hadad was an Egyptian national was "all but irrelevant." *El-Hadad*, 496 F.3d at 667. Thus, third-country local hire employees may still be considered civil servants and the employment relationship may still qualify for immunity under the FSIA. Here too, Plaintiff is an Egyptian national and the fifth factor is also all but irrelevant.

Moreover, as the D.C. Circuit explained, even if the Embassy employee is not a civil servant, the employee's work and employment may still come under the protection of sovereign immunity based on the governmental function of that work. As the court put it, "[a] foreign government's employee might not be a civil servant … and still be engaged in quintessentially

government work." *Id.* at 664.  If this Court determines that Plaintiff was not a civil servant, sovereign immunity still applies if the nature of her work constitutes government work.  "One distinctive mark of governmental work is discretionary involvement with … policy." *Id.* at 668. Furthermore, statutory language provides the guidance that whether or not an activity will constitute "commercial activity" is to be determined by the nature of the work as opposed to the work's purpose.  28 U.S.C. § 1603(d).

The combination of these two guiding principles demonstrates that Plaintiff's work was governmental, and therefore her employment relationship is protected by the FSIA and not subject to the commercial activity exception.  Unlike an embassy accountant, whose duties are "of a character easily found in commercial enterprise, *El-Hadad*, 496 F.3d at 668, Plaintiff was integrally involved in the running of the Cultural Division and, specifically, its Academic office. Plaintiff's role as the Employees Affairs Officer was such that she was the first reviewer of proposed changes in the Cultural Division's policy before the final decision was made by the Cultural Attaché.  Moreover, Plaintiff was able to determine whether to process certain changes, thereby effectively making discretionary policy decisions.  For instance, Plaintiff declined to process paperwork relating to salaries based on a specific scholarship program's implementation and, by doing so, stopped the raises from going into effect.  Consistent with Plaintiff's role, she was employed on an A-2 visa, which is issued to government officials representing a foreign government or full-time employees at a foreign embassy.  *See* Ex. F.

Importantly, Plaintiff's employment agreement expressly states that she may be sent on "official duty," an obligation which is clearly governmental in nature.  *See* Ex. D  art. 14(b); Ex. E art. 15.  Thus, from the outset of Plaintiff's employment, the Embassy (and the Cultural Division) contemplated that her work could involve the exercise of official duties.  As the D.C.

Circuit emphasized, "the ultimate question" in determining whether the commercial exception applies is whether the employee's work involved only "the exercise of 'powers that can … be exercised by private citizens, as distinct from those powers peculiar to sovereigns.'" *El-Hadad*, 496 F.3d at 667 (quoting *Nelson*, 507 U.S. at 360).

The nature of Plaintiff's work was such that she was able to execute discretionary functions. This discretionary ability and its effect on the Cultural Division's policies, combined with her ability to be sent on official duties, places Plaintiff squarely as an employee engaged in government work and thus subject to the immunities granted in the FSIA.[7]

### B.    Even If the UAE Is Not Protected by Sovereign Immunity, the Case Must Proceed Without a Jury, and this Court Should Therefore Strike the Jury Trial Demand

Plaintiff's demand for a trial by jury is inappropriate and should be stricken from the complaint. Under the FSIA, if a foreign state is not entitled to sovereign immunity, there is no right to a jury trial, because the court only holds jurisdiction over a nonjury civil action. *See* 28 U.S.C. § 1330(a); *El-Hadad v. Embassy of the U.A.E.*, 69 F. Supp. 2d 69, 76 (D.D.C. 1999). When there is no federal right to a jury trial in an action, a court may not submit the issue to a jury.

Therefore, if the Court finds (though it should not) that it has jurisdiction because sovereign immunity does not apply, then Plaintiff's request for a jury is an incorrect jury demand. We respectfully request the Court strike Plaintiff's jury demand as to all defendants and all counts. *See El-Hadad*, 69 F. Supp. 2d at 76 (striking the jury demand against the foreign state, foreign embassy, and individual defendants).

---

[7] *El-Hadad* is distinguishable from this case because the D.C. Circuit in *El-Hadad* did not consider (since it had no occasion to do so) whether the employee was closely integrated into an embassy's division performing diplomatic functions. To the extent this Court concludes otherwise, however, the UAE also respectfully preserves for possible appellate review the issue that the sovereign immunity analysis in *El-Hadad* should be reconsidered and modified.

### C.      Plaintiff's DCHRA Claim Is Precluded by the Federal Enclave Doctrine

During Plaintiff's employment with the Cultural Division, the Division's offices were located within the UAE Embassy at 3522 International Court NW, Washington, DC 20008.  This area is known as the International Chancery Center and it is a high-security enclave in the Van Ness neighborhood in the District of Columbia, on the federally owned grounds of the former National Bureau of Standards.  The ICC was originally conceived in the early 1960s, and was developed as an enclave on *federal property*.  *See* U.S. Dep't of State, *International Chancery Center: History of the International Chancery Center (ICC)*, https://www.state.gov/ofm/property/icc/index.htm, attached as Ex. G.  This property is therefore separate and distinct from the territory of the District of Columbia.

Under the federal enclave doctrine, U.S. Const. art. I, § 8, cl. 17, state or local law that is adopted after the creation of the enclave generally does not apply to the enclave.[8]  It is well-established that after a locality has transferred authority over a tract of land creating a federal enclave, the local jurisdiction may no longer impose new state laws on the enclave.  Thus, when the "United States acquires with the 'consent' of the state legislature land within the borders of that State . . . the jurisdiction of the Federal Government becomes 'exclusive.'"  *Paul v. United States,* 371 U.S. 245, 264 (1963).  Furthermore, "[t]he power of Congress over federal enclaves that come within the scope of Art. I, § 8, cl. 17, is obviously the same as the power for Congress over the District of Columbia."  *Id.* at 263.

Here, at all relevant times, Plaintiff's workplace was located within the ICC federal enclave.  Furthermore, Plaintiff's stated cause of action arises under the DCHRA, a law that was

---

[8] Specifically, the Constitution empowers Congress to exclusively regulate properties acquired from state governments.  Congress "shall have Power . . . *to exercise exclusive Legislation . . . over all Places purchased by the consent of the Legislature of the State in which the Same shall be,* for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings."  U.S. Const. art. I § 8, cl. 17 (emphasis added).

enacted in 1977 (i.e., *after* the creation of the federal enclave in which she worked).  *See generally* District of Columbia Human Rights Act of 1977.  Thus, pursuant to the Federal Enclave Doctrine, Plaintiff's cause of action arising under the DCHRA is inapplicable and must therefore be dismissed.

IV.    <u>CONCLUSION</u>

For all of the reasons set forth above, the United Arab Emirates respectfully requests that this Court dismiss Plaintiff's Complaint in its entirety or, if the Court finds jurisdiction, strike the demand for a jury trial.

Dated: September 24, 2018

Respectfully submitted,

<u>/s/ Igor V. Timofeyev</u>
Scott M. Flicker (DC Bar No. 425825)
Igor V. Timofeyev (DC Bar No. 998291)
Kenneth M. Willner (DC Bar No. 415906)
PAUL HASTINGS LLP
875 15th Street, N.W.
Washington, D.C. 20005
Telephone: (202) 551-1792
Facsimile: (202) 551-1705
scottflicker@paulhastings.com
igortimofeyev@paulhastings.com
kenwillner@paulhastings.com

*Counsel for the Specially Appearing Defendants the United Arab Emirates and
the Embassy of the United Arab Emirates*

**CERTIFICATE OF SERVICE**

I hereby certify that on Monday, September 24, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Sylvia J. Rolinski, Esq.
Rolinski Law Group, LLC
14915 River Road
Potomac, MD 20854
Tel. (301) 987-0202
Fax (301) 263-7100
sjr@rolinski.com

Daniel K. Gebhardt, Esq.
Solomon Law Firm, PLLC
1025 Connecticut Avenue, N.W.
Washington, D.C. 20036
Tel. (866) 833-3529
Fax (202) 688-1896
dgebhardt@fedemploylaw.com

/s/ Igor V. Timofeyev
Igor V. Timofeyev