## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ABLA ABDEL BASET YOUSSEF, )<br><br>Plaintiff, )<br><br>v. )<br><br>EMBASSY OF THE UNITED ARAB<br>EMIRATES, *et al.*, )<br><br>Defendants. ) | No. 17-cv-2638 (KBJ) |

## <u>MEMORANDUM OPINION</u>

On January 3, 2016, Plaintiff Abla Youssef was terminated from her employment with Defendant United Arab Emirates Embassy in Washington, D.C., after almost eighteen years of service. (*See* Compl., ECF No. 1, ¶ 12.) Youssef had held two positions at the embassy during the course of her employment: beginning in 1998, she first worked as a secretary in the Human Resources Department of the Embassy's Cultural Division, and then served as an administrative officer in that same department. (*See id.*) Youssef brings the instant claims against the Embassy and the United Arab Emirates ("UAE" and, collectively, "Defendants"), claiming that she was terminated the day before her 67th birthday because she was over the customary retirement age in the UAE (*see id.* ¶¶ 23–24), and that this termination amounted to discrimination on the basis of her age in violation of both the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq.* (*see id.* ¶¶ 38–42), and the D.C. Human Rights Act ("DCHRA"), D.C. Code § 2-1401 *et seq.* (*see id.* ¶¶ 43–47).

Before this Court at present is Defendants' motion to dismiss Youssef's complaint (*see* Defs.' Mot. to Dismiss, ECF No. 30; Defs.' Mem. in Supp. of Mot. to Dismiss ("Defs.' Mot."), ECF No. 30-1), which Youssef opposes (*see* Pl.'s Mem. in Opp'n to Defs.' Mot. ("Pl.'s Opp'n"), ECF No. 31-1).  In their motion to dismiss, Defendants argue, first and foremost, that this Court does not have subject-matter jurisdiction to hear Youssef's complaint, because the UAE and the Embassy enjoy sovereign immunity under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 *et seq.*, and the commercial activity exception to the FSIA does not apply to Youssef, who Defendants characterize as a UAE civil servant, insofar as she performed governmental work for the Embassy.  (*See* Defs.' Mot. at 14–22.)[1]  Defendants further maintain that Youssef has failed to state a DCHRA claim, "because at all relevant times, her workplace was located in a federal enclave[,]" such that the DCHRA is inapplicable.  (*Id.* at 7.)

For the reasons explained fully below, this Court disagrees with Defendants on both fronts: the Court concludes that the commercial activity exception to the FSIA applies to Youssef's employment with the Embassy, and thus that the Court has subject-matter jurisdiction over Youssef's claims.  The Court also finds that Youssef has stated a plausible claim under the DCHRA, because the federal enclave doctrine is inapplicable to the District of Columbia.  Accordingly, Defendants' motion to dismiss will be **DENIED**.  A separate Order consistent with this Memorandum Opinion will follow.

---

[1] Page-number citations to the documents that the parties and the Court have filed refer to the page numbers that the Court's electronic case filing system automatically assigns.

## I.     BACKGROUND

### A.     Factual Background[2]

Youssef was born in 1949 and is an Egyptian citizen.  (Compl. ¶ 11.)  She was employed in the Human Resources Department of the UAE Embassy's Cultural Division, in Washington, D.C., for almost eighteen years before her employment was terminated, and during that time she allegedly worked in two different administrative capacities: her title was initially "Administrative Affairs Secretary[,]" and then, at some point, she began serving as an "Administrative Officer[.]"  (*See id.* ¶ 12.)

UAE Cultural Attaché Suaad Zayed Al Oraimi was Youssef's supervisor during her time as an Administrative Officer.  (*See id.* ¶ 23.)  According to the complaint, six months before Youssef's employment was terminated, Al Oraimi told Youssef that she had to leave the Embassy because she was over 65 years old.  (*See id.* ¶¶ 21–22.)  Youssef also allegedly received a letter from her supervisor on December 3, 2015, stating that she would be terminated as of January 3, 2016, the day before her 67th birthday.  (*See id.* ¶ 23.)  The complaint alleges that Al Oraimi offered Youssef the option of extending her employment until April of 2016, on the condition that Youssef sign a resignation letter, but Youssef "refused to sign a letter of resignation, since she was actually being terminated[.]"  (*Id.* ¶ 32.)  Before the end of Youssef's employment with the Embassy, Al Oraimi allegedly required Youssef to train the younger employee who would take over Youssef's duties.  (*See id.* ¶ 29.)  And, on January 12, 2016, nine days after her termination, Youssef allegedly received a letter from the Embassy, which

---

[2] The facts recited herein are undisputed unless otherwise noted.  They are drawn from the complaint and the various exhibits attached to the parties' briefs, which include Youssef's employment contracts with the UAE Embassy.

confirmed that she was terminated because she was over 65 years old—since that age, according to the letter, is the customary retirement age in the UAE.  (*See id.* ¶ 24.)

Significantly for present purposes, throughout her time at the Embassy, Youssef was employed pursuant to successive one-year employment contracts, which were renewed on an annual basis.  (*See id.* ¶¶ 17–18.)  Youssef alleges that, under those agreements, she was "not entitled to UAE civil service benefits or to any other benefits, rights, or remedies provided by the laws of [the] UAE[.]"  (*Id.* ¶ 17.)  Moreover, Youssef's June 2001 contract describes her job title as "Administrative Affairs Secretary[,]" and lists her job duties to include: "Typing all procedures related to administrative affairs" and "all purchase orders for procurement and warehouses"; "Filing and organizing employee files"; "Registering and sending the outgoing diplomatic pouch to the Ministry of Higher Education and Scientific Research"; "Registering external and internal outgoing[,]" and "external and internal incoming"; "Receiving and registering all bounced and returned checks from the receptionist and handing them to the Financial Affairs Department"; "Any assignments by the Cultural Attaché"; and "Any other duties assigned thereto."  (Ex. D to Defs.' Mot. ("2001 Contract"), ECF No. 30-6, at 8.)[3]

---

[3] Defendants attached Youssef's 2001 and 2011 employment contracts as exhibits to their motion to dismiss.  This Court can rely on those documents at the motion to dismiss stage, because the Court construes Defendants' FSIA arguments as raising a factual challenge to the Court's subject-matter jurisdiction, *see infra* Part II, which requires the Court to "go beyond the pleadings and resolve any disputed issues of fact" underlying the jurisdictional determination, *Phoenix Consulting Inc. v. Republic of Angl.*, 216 F.3d 36, 40 (D.C. Cir. 2000).  Even if Defendants' contentions were treated as a facial challenge to jurisdiction under the FSIA, this Court can consider "documents incorporated by reference" in the complaint, *World Wide Mins., Ltd. v. Republic of Kaz.*, 296 F.3d 1154, 1157 n.2 (D.C. Cir. 2002), and Youssef's complaint specifically references the terms of her employment contracts (*see* Compl. ¶¶ 17–18).

According to the complaint, Youssef's responsibilities varied only slightly in her subsequent role as an Administrative Officer (*see* Compl. ¶ 12); the complaint alleges that, in addition to her secretarial responsibilities, she also maintained personnel records for all local employees of the Embassy's Cultural Division (*see id*. ¶ 14; *see also id*. ¶ 15 (specifically alleging that Youssef "did not process any personnel records of UAE civil servants")).  Youssef's contract for 2011 is silent as to her precise work duties.  But the agreement lists her job title as "Administrative Officer" or "Administrative Affairs Officer" (depending on the translation) in the line below her signature, and it specifically cross-references Youssef's June 2001 contract.  (*See* Ex. 1 to Pl.'s Opp'n ("2011 Contract"), ECF No. 31-2, at 20–21; Ex. E to Defs.' Mot., ECF No. 30-7, at 11–12.)

Both the 2001 and 2011 contracts further specify that, while Youssef "may be sent on official duty to the Ministry Head Office in the United Arab Emirates at the Ministry's cost and expense in accordance with the applicable financial regulations of the Ministry" (2011 Contract at 19; *see* 2001 Contract at 7), she "does not have authority to render the Mission a party to any binding commitment of any kind whatsoever arising between [herself] and any other person or entity, whether governmental or non-governmental" (2011 Contract at 19; *see* 2001 Contract at 7).  Both contracts also include provisions for paid leave (*see* 2001 Contract at 3; 2011 Contract at 7–8), health insurance (*see* 2011 Contract at 4) or a medical allowance (*see* 2001 Contract at 2), and end-of-service benefits (*see* 2001 Contract at 6; 2011 Contract at 16–17).[4]

---

[4] These benefits are contractual in nature and, according to Youssef, they are not concomitant with "UAE civil service benefits[.]"  (Compl. ¶ 17.)

### B.      Procedural History

On February 19, 2016, forty-seven days after the UAE Embassy terminated her employment under the circumstances described above, Youssef filed a complaint with the U.S. Equal Employment Opportunity Commission ("EEOC") and the D.C. Office of Human Rights, alleging age-based discrimination.  (*See* Compl. ¶¶ 10, 29.)  During the administrative proceedings, the Embassy allegedly represented that Youssef was terminated due to downsizing (*see id.* ¶ 29), even though, according to the complaint, the UAE Ministry of Higher Education in 2014 set forth a mandate to hire four additional academic advisers in Washington, D.C., and to increase the salaries of all employees at the Cultural Division (*see id.* ¶ 30).[5]

Youssef filed the complaint in the instant matter on December 8, 2017.  She alleges two counts of discrimination on the basis of age: one under the ADEA (*see id.* ¶¶ 38–42 ("Count I")) and the other under the DCHRA (*see id.* ¶¶ 43–47 ("Count II")). The complaint was served on Defendants on February 7, 2018 (*see* Certificate of Mailing, ECF No. 9), and when Defendants failed to appear or otherwise respond, Youssef sought entry of default on April 12, 2018 (*see* Aff. in Supp. of Default, ECF No. 14), which the Clerk of Court entered on April 25, 2018 (*see* Default, ECF No. 20). The next day, Defendants' counsel appeared specially and filed a motion to quash service of process and to vacate the entry of default on the grounds of improper service (*see* Defs.' Mot. to Quash Service of Process and Vacate Entry of Default, ECF No. 24, at 1–2), which this Court granted in part (*see* Min. Order of June 8, 2018).  Youssef subsequently cured the service defects (*see* Ex. 1 to Pl.'s Proof of Service, ECF

---

[5] As Youssef's counsel acknowledged at the motion hearing, records concerning this alleged EEOC complaint have not been filed on the docket in this case.  (*See* Mot. Hr'g Tr., ECF No. 38, at 60:1–3.)

No. 25-1, at 2-3), and Defendants then moved to dismiss both of the claims in Youssef's complaint (*see* Defs.' Mot.).  Youssef filed an opposition to the motion on October 9, 2018 (*see* Pl.'s Opp'n), and Defendants filed their reply on November 6, 2018 (*see* Defs.' Reply in Supp. of Mot. to Dismiss ("Defs.' Reply"), ECF No. 33).

In their motion to dismiss, Defendants maintain that the UAE and the Embassy enjoy sovereign immunity under the FSIA, and therefore this Court lacks subject-matter jurisdiction to consider Youssef's claims.  (*See* Defs.' Mot. at 14–22.)  In this regard, Defendants specifically argue that "[t]he instant action arises out of a uniquely governmental, not commercial, function"—that is, "the promotion of educational exchange between nations"—and that "the alleged discrimination against an employee directly involved in the Cultural Division's diplomatic mission . . . is not 'based upon' commercial activity as contemplated in the FSIA, nor is Plaintiff's 'employment' a commercial activity[,]" given "Plaintiff's role and effective responsibilities at the Cultural Division[,]" which "included exercises of discretion that renders her employment akin to that of a civil servant[.]"  (*Id.* at 14–15.)  With respect to the DCHRA claim, Defendants contend that Youssef fails to state a claim upon which relief can be granted, because at all relevant times her workplace was located in a "federal enclave" that was created in the 1960s, and it is well established that, "after a locality has transferred authority over a tract of land creating a federal enclave, the local jurisdiction may no longer impose new state laws on the enclave"—which, Defendants say, makes the DCHRA (which was enacted in 1977) inapplicable to Youssef's workplace.  (*Id.* at 23–24.)

Youssef's opposition brief counters that this Court does have subject-matter jurisdiction consistent with the FSIA, because her lawsuit falls within the scope of the commercial activity exception, given that she "was not a UAE civil servant: her employment contract did not designate her as a civil servant; she did not receive UAE civil servant benefits or tenure; and her employment was not subject to UAE laws governing civil servants or diplomats." (Pl.'s Opp'n at 24–25.) Youssef insists further that "Defendants' description of [her] employment duties fails to distinguish how her work was qualitatively different from that of any private-sector human resources or secretarial, clerical employee" (*id.* at 27), and the fact that "Defendants could hire any private, third-party employee to perform [her] job duties" places her "employment squarely within the commercial activity exception" (*id.* at 31). Lastly, Youssef takes the position that the federal enclave doctrine does not apply to embassies located in Washington, D.C., and thus her DCHRA claim can proceed. (*See id.* at 40–41.)

This Court held a motion hearing on October 3, 2019 (*see* Min. Entry of Oct. 3, 2019), after which Defendants filed a notice of supplemental authority on the federal enclave issue (*see* Defs.' Notice of Suppl. Authority, ECF No. 37). Youssef subsequently moved to strike Defendants' notice, on the grounds that "supplemental legal authority was not called for by [the] Court[,]" and "Defendants' notice merely cites additional authority for the argument they already made in briefing their Motion to Dismiss[.]" (Pl.'s Mot. to Strike, ECF No. 39, at 3, 6; *see also* Defs.' Resp. to Mot. to Strike, ECF No. 40; Pl.'s Reply to Mot. to Strike, ECF No. 41.) Defendants' motion to dismiss and Youssef's motion to strike are now ripe for decision.[6]

---

[6] Defendants have also moved to strike the demand for a jury trial in Youssef's complaint (*see* Compl. ¶ 49), on the ground that the FSIA permits jurisdiction over only a "nonjury civil action" (Defs.' Mot.

## II.   MOTIONS TO DISMISS UNDER RULES 12(b)(1) AND 12(b)(6) IN FSIA CASES

When a defendant moves to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(1) for lack of subject-matter jurisdiction in a case that implicates the FSIA, "the defendant may challenge either [1] the legal sufficiency of the allegations that appear on the face of the complaint or [2] the factual underpinning of [the] exception upon which the plaintiff relies, or both." *SACE S.p.A. v. Republic of Para.*, 243 F. Supp. 3d 21, 32 (D.D.C. 2017) (internal quotation marks and citation omitted). Thus, "[a] facial challenge attacks the factual allegations of the complaint that are contained on the face of the complaint, while a factual challenge is addressed to the underlying facts contained in the complaint." *Id.* (internal quotation marks and citation omitted).

If the defendant makes a facial challenge, "the court must accept as true the allegations in the complaint and consider the factual allegations of the complaint in the light most favorable to the non-moving party[,]" *Erby v. United States*, 424 F. Supp. 2d 180, 182 (D.D.C. 2006), just as it would with respect to a motion under Rule 12(b)(6), *see Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 93 (D.C. Cir. 2002). And to survive a facial challenge, the complaint's allegations, "if true, must show that the defendant's conduct falls within the ambit of at least one of the FSIA's exceptions to sovereign immunity." *Agrocomplect, AD v. Republic of Iraq*, 524 F. Supp. 2d 16, 21 n.8 (D.D.C. 2007).

---

at 22 (citing 28 U.S.C. § 1330(a))). Youssef's opposition brief represents that she "withdraws her jury demand pursuant to 28 U.S.C. § 1330(a)." (Pl.'s Opp'n at 10 n.1.) Accordingly, Defendants' motion to strike Youssef's jury demand is **DENIED AS MOOT**.

By contrast, if the defendant brings a factual challenge to the complaint, the Court "may consider materials outside the pleadings" in order to determine whether it has subject-matter jurisdiction over the challenged claims, *Jerome Stevens Pharms., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005), just as it would with respect to a motion to dismiss brought under Rule 12(b)(1). Moreover, "factual challenges relating to the FSIA employ a burden-shifting framework for determining whether or not an FSIA exception applies[.]" *CapitalKeys, LLC v. Dem. Rep. Congo*, No. 15-cv-2079 (KBJ), 2021 WL 2255362, at *8 (D.D.C. June 3, 2021) (internal quotation marks and citation omitted). The plaintiff seeking to establish the court's subject-matter jurisdiction "bears the initial burden of supporting [her] claim that [an] FSIA exception applies." *Chevron Corp. v. Ecuador*, 795 F.3d 200, 204 (D.C. Cir. 2015). But once the plaintiff has met that initial burden of production, "the sovereign bears the ultimate burden of persuasion to show the exception does not apply[.]" *Bell Helicopter Textron, Inc. v. Islamic Republic of Iran*, 734 F.3d 1175, 1183 (D.C. Cir. 2013).

When a defendant moves to dismiss a complaint brought against a foreign state or entity for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), the familiar standards apply. That is, the court must presume the truth of a complaint's factual allegations, but is "not bound to accept as true a legal conclusion couched as a factual allegation[,]" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation marks and citation omitted), and the court then asks whether the facts alleged suffice "to state a claim to relief that is plausible on its face[,]" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted). When deciding a motion to dismiss under Rule 12(b)(6), the court considers any "facts alleged in the

complaint, any documents either attached to or incorporated in the complaint[,] and matters of which [the court] may take judicial notice." *Mpoy v. Rhee*, 758 F.3d 285, 291 n.1 (D.C. Cir. 2014) (internal quotation marks and citation omitted).

## III.   ANALYSIS

Defendants invoke two distinct immunity doctrines against Youssef's lawsuit: they first contend that Youssef's federal and District of Columbia law claims are barred based upon the doctrine of foreign sovereign immunity, and they also maintain that her DCHRA claim is precluded under the federal enclave doctrine.  For the reasons explained fully below, this Court rejects both of Defendants' arguments.  The Court concludes that Defendants cannot invoke the FSIA to claim sovereign immunity from the instant lawsuit—which is based upon Youssef's employment relationship with the Embassy—because Youssef was contracted to work as a non-civil servant, and she had duties that were clerical (as opposed to governmental) in nature.  And to the extent that Defendants are relying on the federal enclave doctrine, it is clear to this Court that the doctrine is inapplicable to those local statutes that the District of Columbia Council has enacted pursuant to its congressionally delegated authority.  Accordingly, Defendants' motion to dismiss must be denied.

### A.   This Court Has Subject-Matter Jurisdiction Over Youssef's Claims Under The FSIA's Commercial Activity Exception

#### 1.   Foreign Sovereigns Are Not Immune From Suits Based On Commercial Employment Relationships In The United States

Foreign states are generally "immune from the jurisdiction of the courts of the United States . . . unless one of [the FSIA's] several statutorily defined exceptions applies." *Republic of Arg. v. Weltover, Inc.*, 504 U.S. 607, 610–11 (1992) (internal quotation marks and citation omitted); *see also McKesson Corp. v. Islamic Republic of*

*Iran*, 672 F.3d 1066, 1075 (D.C. Cir. 2012) (observing that all of the statute's exceptions to foreign sovereign immunity are "narrowly drawn").[7]  As relevant here, a foreign state is *not* entitled to immunity per the statute when it acts in a *commercial* capacity, as opposed to a sovereign one, *see Bolivarian Republic of Venez. v. Helmerich & Payne Int'l Drilling Co.*, 137 S. Ct. 1312, 1320 (2017); in this regard, the FSIA specifically provides that "[a] foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case . . . in which the action is based upon a commercial activity carried on in the United States by the foreign state[,]" 28 U.S.C. § 1605(a)(2).

Notably, "commercial activity" is further defined in the statute as "either a regular course of commercial conduct or a particular commercial transaction or act[,]" *id.* § 1603(d), and the FSIA provides that whether or not an activity qualifies as commercial "shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose[,]" *id.*  As the Supreme Court has explained, "the issue is whether the particular actions that the foreign state performs (whatever the motive behind them) are the *type* of actions by which a private party engages in trade and traffic or commerce." *Weltover*, 504 U.S. at 614 (internal quotation marks and citation omitted); *see also Saudi Arabia v. Nelson*, 507 U.S. 349, 360 (1993) (stating that a foreign state engages in commercial activity "where it exercises only those powers that can also be exercised by private citizens, as

---

[7] The FSIA defines a "foreign state" to encompass "a political subdivision of a foreign state or an agency or instrumentality of a foreign state[,]" 28 U.S.C. § 1603(a), which includes embassies, *see, e.g.*, *Ashraf-Hassan v. Embassy of Fr.*, 610 F. App'x 3, 5 (D.C. Cir. 2015).

distinct from those powers peculiar to sovereigns" (internal quotation marks and citation omitted)).

In employment cases, the D.C. Circuit has addressed the commercial activity exception in what can be fairly described a three-part analysis.  Under this analysis, a court must first determine what the plaintiff's claims are "based upon," *El-Hadad v. United Arab Emirates*, 496 F.3d 658, 663 (D.C. Cir. 2007) ("*El-Hadad II*"); *see also* 28 U.S.C. § 1605(a)(2)—*i.e.*, whether or not commercial activity is the "gravamen" of the plaintiff's claims, *OBB Personenverkehr AG v. Sachs*, 577 U.S. 27, 35 (2015).  And, notably, it is by now well established that in order for the suit to be "based upon" the commercial activity for FSIA purposes, the activity in question must relate to the "elements of [the plaintiff's] claim that, if proven, would entitle a plaintiff to relief under his theory of the case."  *Goodman Holdings v. Rafidain Bank*, 26 F.3d 1143, 1145 (D.C. Cir. 1994) (quoting *Nelson*, 507 U.S. at 357).  For example, the D.C. Circuit has held that a plaintiff's hostile work environment claims were based upon "the course of her employment at the Embassy" where she worked, because such claims are "necessarily premised on" the existence of an employment relationship.  *Ashraf-Hassan*, 610 F. App'x at 5; *see also, e.g.*, *Merlini v. Canada*, 926 F.3d 21, 28–30 (1st Cir. 2019) (concluding that a plaintiff's claim for workers' compensation over injuries she sustained at her workplace was "'based on' Canada's employment of her as a clerical worker[,]" because her employment "provides the legal basis for the only cause of action that she has against her employer for [her] injury").  Thus, D.C. Circuit precedent "makes clear that the [mere] employment of personnel by a foreign state is not per se commercial activity under the FSIA[,]" *El-Hadad v. United Arab Emirates*,

216 F.3d 29, 31 (D.C. Cir. 2000) ("*El-Hadad I*"); however, such an employment relationship *can* sometimes be the basis for application of the commercial activity exception for FSIA purposes, *see El-Hadad II*, 496 F.3d at 663.

If the plaintiff's claim is based upon the terms or conditions of her employment, the court must then proceed to identify the characteristics of the employment relationship at issue, because "[t]he commercial-activities exception has been deemed to apply [only] to employment relationships that exhibit certain characteristics[.]" *Ashraf-Hassan v. Embassy of Fr.*, 40 F. Supp. 3d 94, 102 (D.D.C. 2014); *see also El-Hadad II*, 496 F.3d at 664 & n.2 (clarifying that the key question is whether the plaintiff worked for the foreign sovereign as a "civil servant," on the one hand, or a mere "commercial employee," on the other).  The D.C. Circuit has generally relied upon the FSIA's legislative history to identify the features of an employment relationship that make it *non*-commercial, and thus *not* subject to the commercial activity exception, and it has contrasted those characteristics with employment that should be deemed commercial in nature.  Thus, the Circuit has concluded that "'the employment of diplomatic, civil service, or military personnel'" is "'[p]ublic or governmental and not commercial in nature,'" while "commercial and not public or governmental in nature would be the 'employment or engagement of laborers, clerical staff, or public relations or marketing agents.'"  *El-Hadad II*, 496 F.3d at 663 (quoting H.R. Rep. No. 94-1487, at 16 (1976)).

Moreover, because "some countries might lack the notion of a 'civil service' altogether, and others might define the notion in a way far afield of [the] FSIA's purpose[,]" the D.C. Circuit "take[s] a flexible and inclusive approach to determining

whether a foreign government's employee is a civil servant[,]" and therefore whether the employment relationship is non-commercial. *Id.* at 665. This approach focuses on "five generally relevant considerations," which are "not exclusive, necessarily applicable in all cases, or, unfortunately (but unavoidably), analytically precise[.]" *Id.* These factors are:

> *First*, how do the [foreign sovereign's] own laws define its civil service, and do [plaintiff's] job title and duties come within that definition?
> *Second*, what was the nature of [plaintiff's] employment relationship with the [foreign sovereign]? Did he have a true contractual arrangement, or is his "contract" claim instead based . . . solely upon the civil service laws of the [foreign sovereign]?
> *Third*, what was the nature of [plaintiff's] employment relationship when he worked in the [foreign state], and how did his subsequent employment at the Embassy relate to that prior tenure? . . .
> *Fourth*, what was the nature of [plaintiff's] work? . . . Congress indicated that the "employment or engagement of laborers, clerical staff or public relations or marketing agents" would come within the definition of commercial activity. . . . [and]
> *Fifth*, what is the relevance of [plaintiff's] . . . nationality on the facts of this case? Is the [foreign sovereign] a country in which . . . non-nationals are unlikely to be employed as governmental officers? Or does the [foreign sovereign] often employ non-nationals in governmental positions?

*El-Hadad I*, 216 F.3d at 34 (emphases added). Additionally, the D.C. Circuit has acknowledged that "[m]ultifactor tests tend to be inconclusive," *El-Hadad II*, 496 F.3d at 667, and it has thus determined that, in this context—where "the foreign sovereign has the burden of proof" to establish its sovereign immunity, *id.* at 665; *see also Ivanenko v. Yanukovich*, 995 F.3d 232, 236 (D.C. Cir. 2021)—any lack of definitiveness concerning the nature of the employment relationship at issue "would decide the matter in [plaintiff's] favor[,]" *El-Hadad II*, 496 F.3d at 667.

The third step of the D.C. Circuit's three-part analysis is premised on a court's part-two conclusion that the plaintiff is *not* a civil servant.  If that finding is made, then the court must proceed to decide if the work that the plaintiff performed for the foreign state was itself governmental in nature—*i.e.*, "whether [her] work involve[d] the exercise of 'powers that can also be exercised by private citizens, as distinct from those powers peculiar to sovereigns.'"  *Id.* at 664 (quoting *Nelson*, 507 U.S. at 360); *see also id.* (explaining that "[a] foreign government's employee might not be a civil servant (or diplomat or soldier) and still be engaged in quintessentially governmental work").  If the court determines at this final step that the plaintiff's work was commercial rather than governmental, the result is that the plaintiff's "suit is authorized under the [FSIA's] commercial activity exception."  *Id.* at 668.

2.   <u>Youssef Was Not A Civil Servant, And Her Employment With The Embassy Was Commercial In Nature; Therefore, The Commercial Activity Exception Applies To Her Claims</u>

This Court's analysis of whether Youssef's claims fall within the commercial activity exception to the FSIA is guided by the principles that the D.C. Circuit announced in *El-Hadad*.  To start, this Court finds that Youssef's claims are "based upon" her employment relationship with the Embassy, and, more precisely, Defendants' allegedly unlawful termination of that employment relationship.  That is, it is clear beyond cavil that the gravamen of Youssef's claims is her allegation that she was wrongfully terminated from her position at the Embassy on the basis of her age (*see* Compl. ¶¶ 1, 25, 36), and her employment relationship with the Embassy is thus a necessary component of her claims, *see Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008) (noting that the "essential elements of a discrimination claim" under the ADEA include proving that "the plaintiff suffered an adverse employment action").

16

As a result, this case plainly implicates *El-Hadad*'s framework for assessing "the commercial activity exception as applied in the employment context." *El-Hadad II*, 496 F.3d at 663.

Next, based on *El-Hadad*'s multi-factor test, the Court is persuaded that Youssef was not a UAE civil servant. The first factor—how "the U.A.E.'s own laws define its civil service" and whether Youssef's "job title[s] and duties come within that definition[,]" *El-Hadad I*, 216 F.3d at 34—supports that conclusion. Indeed, Youssef's employment contracts do not designate her as a civil or public servant in any way, nor do they grant her UAE civil servant benefits or tenure. (*See* 2001 Contract at 2–4; 2011 Contract at 4–10; *see also* Compl. ¶ 17 (alleging that Youssef "was not entitled to UAE civil service benefits or to any other benefits, rights, or remedies provided by the laws of [the] UAE").) Additionally, Youssef's contracts with the Embassy contain no indication that her employment was subject to UAE law governing civil servants or diplomats. (*See generally* 2001 Contract at 2–8; 2011 Contract at 2–21.) *El-Hadad*'s second factor, which somewhat relatedly asks about "the nature of [Youssef's] employment relationship with the U.A.E.[,]" *El-Hadad I*, 216 F.3d at 34—and, in particular, whether she had "a true contractual arrangement" rather than relying "solely upon the civil service laws of the U.A.E.[,]" *id.*—points in the same direction. As detailed above, Youssef worked for the UAE Embassy pursuant to written employment contracts, which were titled "Local Employment Contract for Employees at the United Arab Emirates Representative Mission" (2001 Contract at 2) or "Local Employment Contract for the Embassy of the United Arab Emirates" (2011 Contract at 2), and neither written agreement mentions the UAE's civil service in any respect (*see*

17

*generally* 2001 Contract at 2–8; 2011 Contract at 2–21).  Youssef's complaint also repeatedly disclaims any reliance on the UAE's civil service laws.  (*See, e.g.*, Compl. ¶¶ 13, 17, 36.)

The Court further finds that the fourth *El-Hadad* factor, regarding "the nature of [Youssef's] work[,]" *El-Hadad I*, 216 F.3d at 34—and, especially, whether her work was akin to the work of "laborers, clerical staff or public relations or marketing agents[,]" *id.* (quoting H.R. Rep. No. 94-1487, at 16)—also weighs in favor of a finding that Youssef was not a civil servant.  Youssef's 2001 employment contract, which listed her job title as "Administrative Affairs Secretary[,]" described her job duties as including "[t]yping all procedures related to administrative affairs[,]" "[t]yping all purchase orders for procurement and warehouses[,]" "[f]iling and organizing employee files[,]" and "[r]egistering external and internal" outgoing and incoming correspondence.  (2001 Contract at 8.)  Her 2011 contract likewise lists her job title as "Administrative Officer" or "Administrative Affairs Officer" (2011 Contract at 21), and in lieu of enumerating her duties, it appears that the parties opted merely to reference the 2001 agreement (*id.* at 20).  And because there is no indication that Youssef's responsibilities as an Administrative Officer were materially different from those described in the earlier contract (*see generally id.* at 2–21), Youssef's duties as an Administrative Officer were also plainly "ministerial, not discretionary[,]" like those of an "administrative assistant," and she "lacked authority to determine or articulate policy[,]" *El-Hadad II*, 496 F.3d at 666–67 (internal quotation marks and citation omitted), which for present purposes means that Youssef "is more like the employees

for whom Congress intended [the] FSIA's commercial exception, and less like a civil servant[,]" *id.* at 666.[8]

Defendants' arguments to the contrary are unavailing.  (*See* Defs.' Mot. at 18–22.)  For instance, with respect to *El-Hadad*'s first factor concerning how the laws of the UAE define that country's civil service and whether or not Youssef's job title and duties fall under that definition, Defendants argue that Youssef's "employment contract provided her with 60 days of vacation and sick leave and end-of-service benefits commensurate with her years of employment[,]" and thus she "was afforded the same benefits as the Cultural Division's advisors charged with disseminating scholarships and advising UAE students."  (*Id.* at 18–19.)  But Defendants cite no *evidence* in support of the latter assertion.  And in *El-Hadad*, the D.C. Circuit concluded that the absence of evidence that the plaintiff had "benefits common to other U.A.E. governmental employees" meant that this factor weighed in the plaintiff's favor, "if only slightly and in light of the burden of proof[.]"  *El-Hadad II*, 496 F.3d at 666.

As to the fourth *El-Hadad* factor, regarding the nature of Youssef's work, Defendants point to the fact that Youssef "was employed on an A-2 visa, which is issued to government officials representing a foreign government or full-time employees at a foreign embassy[,]" which Defendants offer in an apparent effort to demonstrate that Youssef was engaged in governmental work.  (Defs.' Mot. at 21; *see*

---

[8] The third *El-Hadad* factor, involving the similarity between "the nature of [the plaintiff's] employment relationship when he worked in the U.A.E." and "his subsequent employment at the Embassy[,]" *El-Hadad I*, 216 F.3d at 34, has no application here, as it is undisputed that Youssef "had no pre-existing relationship with the UAE prior to her employment" with the UAE Embassy "beginning in 1999" (Pl.'s Opp'n at 27; *see also* Defs.' Mot. at 19).  And the fifth factor, regarding "the relevance of [the plaintiff's] Egyptian nationality on the facts of this case[,]" *El-Hadad I*, 216 F.3d at 34, is "all but irrelevant" here—as it was in *El-Hadad*, *see El-Hadad II*, 496 F.3d at 667—because the UAE is not a country that "rarely if ever hires non-citizens for its civil service[,]" *id.*

*also* Defs.' Reply at 6 (arguing that "A-2 visas are available only to foreign government officials who engage solely in official activities for that government [which are] governmental in character or nature, [and not] of a commercial nature" (internal quotation marks and citation omitted)).)  As an initial matter, this Court notes that the D.C. Circuit's *El-Hadad* test is silent as to visa status—even though the plaintiff in *El-Hadad* was also employed on an A-2 visa—and therefore it is doubtful that Youssef's visa status is even relevant to the issue of the applicability of the commercial activity exception.  *See* Defs.' Renewed Mot. to Dismiss, *El-Hadad v. United Arab Emirates*, No. 96-cv-1943, ECF No. 166, at 4 (D.D.C. Feb. 25, 2004) (noting that plaintiff had purportedly "entered the United States several times using his A2 diplomatic visa . . . after he was no longer employed at the Embassy" (internal quotation marks and citation omitted)).

Regardless, as another court in this district has explained, "no adverse conclusion should be drawn from the regulation" that Defendants cite concerning A-2 visas.  *Dahman v. Embassy of Qatar*, No. 17-cv-2628, 2018 WL 3597660, at *8 (D.D.C. July 26, 2018), *vacated on other grounds*, 364 F. Supp. 3d 1 (D.D.C. 2019).  This is because eligibility for A-2 visas turns on whether the foreign employee will be performing work on behalf of her government, and *not* whether that work is commercial in nature.  Indeed, the State Department's regulations make clear that *any* "[f]ull-time employee[] assigned by that government, coming only to work at a foreign embassy or consulate in the United States, to perform duties which take place at an embassy" is eligible for an A-2 visa.  *Id.* (quoting U.S. Dep't of State, Bureau of Consular Affairs,

*Visas for Diplomats and Foreign Government Officials*).[9]  Yet, as explained above, under D.C. Circuit case law, some such employees might still qualify as commercial workers for the purpose of the FSIA.  In other words, Youssef's visa status says nothing about whether or not she was employed by the UAE to engage in commercial activities for the benefit of that country, which is the relevant inquiry when the Court undertakes to decide whether the FSIA's commercial activity exception from sovereign immunity is applicable to her legal claims.

Finally, as to "the ultimate question of whether [Youssef's] work involved the exercise of 'powers that can also be exercised by private citizens, as distinct from those powers peculiar to sovereigns[,]'" *El-Hadad II*, 496 F.3d at 667 (quoting *Nelson*, 507 U.S. at 360), Youssef's duties clearly fall into the former category.  Notably, in conducting this final step of the commercial activity analysis, the Court "look[s] only to the resemblance between 'the outward form' of [Youssef's] conduct and powers and those of private citizens[,]" rather than "whether [Youssef's] work aimed to carry out an international political program or to keep the cultural attaché's office supplied with pens and pencils."  *El-Hadad II*, 496 F.3d at 668 (quoting *Weltover*, 504 U.S. at 617); *see also* 28 U.S.C. § 1603(d) ("The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose.").  And it is clear to the Court from the evidence and allegations presented that Youssef "had no role in the creation of governmental policy, and to the extent [s]he carried it out, [her] duties were ministerial, not discretionary."  *El-Hadad II*, 496 F.3d at 668 (internal quotation marks and citation

---

[9] https://travel.state.gov/content/travel/en/us-visas/other-visa-categories/visas-diplomats.html (last visited Aug. 23, 2021).

omitted).  Instead, Youssef performed standard administrative work, such as "[t]yping"
documents, "[f]iling and organizing employee files[,]" and "[r]egistering"
correspondence (2001 Contract at 8), and each of her activities was "of a character
easily found in commercial enterprise[,]" *El-Hadad II*, 496 F.3d at 668.  Consequently,
the Court concludes that Youssef's "employment was commercial rather than
governmental," such that her "suit is authorized under the [FSIA's] commercial activity
exception."  *Id.*

   In short, this Court concludes that the commercial activity exception to FSIA
sovereign immunity applies with respect to Youssef's claims, because her claims are
"based upon a commercial activity[,]" 28 U.S.C. § 1605(a)(2)—*i.e.*, her employment
relationship with the Embassy, which is not categorically governmental activity—and
Youssef did not work for the Embassy as a civil servant, *see El-Hadad I*, 216 F.3d at
34.  The Court further finds that the work Youssef performed for the Embassy was not
governmental in nature, because it involved the exercise of "powers that can also be
exercised by private citizens, as distinct from those powers peculiar to sovereigns."
*Nelson*, 507 U.S. at 360 (internal quotation marks and citation omitted).  And
throughout this analysis, the Court has been mindful of the fact that the "defendant
bears the burden of proving sovereign immunity, including that the plaintiff's
allegations do not bring [the] case within a statutory exemption to immunity."
*Schubarth v. Fed. Republic of Ger.*, 891 F.3d 392, 398 (D.C. Cir. 2018) (internal
quotation marks and citation omitted).  Defendants have not met their burden here.

**B.    Youssef Has Stated A Claim Under The DCHRA, Because The Federal Enclave Doctrine Is Inapplicable To The Laws Of The District Of Columbia**

The Court next turns to Defendants' invocation of the "federal enclave doctrine" with respect to Youssef's DCHRA claim.  (Defs.' Mot. at 23.)  As explained below, this Court concludes that, while the federal enclave doctrine is typically applicable where a plaintiff's legal claim arises under state law and concerns an entity that is on federal soil within a state territory, the doctrine does not apply to foreign embassies and other similar entities that are located in the District of Columbia.

1.    A State Law That Is Enacted After An Area Becomes A Federal Enclave Generally Does Not Apply To The Enclave

On occasion, the federal government will acquire land from a state for the purpose of constructing or operating a federal facility.  *See, e.g.*, *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 176 (1988); *see also Parker Drilling Mgmt. Servs., Ltd. v. Newton*, 139 S. Ct. 1881, 1890 (2019) (noting that a "federal enclave" is "an area of exclusive Federal jurisdiction located within a State" (internal quotation marks and citations omitted)).  In such instances, a question may arise concerning whether the state laws in effect in the rest of the state's territory also apply to that federal enclave. The Supreme Court has long held that if the state law in question was in effect at the time that the state legislature consented to the transfer of the land to the federal government, then the law *does* generally continue to apply with respect to individuals and entities on that land.  *See Parker Drilling*, 139 S. Ct. at 1890 ("[W]hen an area in a State becomes a federal enclave, 'only the [state] law in effect at the time of the transfer of jurisdiction continues in force' as surrogate federal law." (quoting *James Stewart & Co. v. Sadrakula*, 309 U.S. 94, 100 (1940))).  But any state law that is

enacted *after* the federal government acquires the property is generally inapplicable on that property. *See id.* (explaining that "going forward, state law presumptively does not apply to the enclave"); *see also Paul v. United States*, 371 U.S. 245, 268 (1963) (observing that "only state law existing at the time of the acquisition remains enforceable, not subsequent laws").

This principle is generally referred to as the "federal enclave doctrine," *see, e.g.*, *Thomas v. Securiguard Inc.*, 412 F. Supp. 3d 62, 74 (D.D.C. 2019); *Allison v. Boeing Laser Tech. Servs.*, 689 F.3d 1234, 1236 (10th Cir. 2012), and the doctrine finds its authority in the Enclave Clause of the United States Constitution, which authorizes Congress "[t]o exercise exclusive Legislation . . . over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings[,]" U.S. Const. art. I, § 8, cl. 17. And when the federal enclave doctrine applies to preclude claims under state law, "dismiss[al] under Rule 12(b)(6)" is proper, because those state "causes of action are not applicable" to the federal enclave. *Colon v. United States*, 320 F. Supp. 3d 733, 745 (D. Md. 2018).

2.   <u>The Federal Enclave Doctrine Does Not Bar Youssef's DCHRA Claim, Because That Doctrine Does Not Apply To Laws That The District Of Columbia Council Enacts Pursuant To Its Congressionally Delegated Legislative Authority</u>

In the instant matter, Defendants argue that Youssef's DCHRA cause of action fails to state a claim upon which relief can be granted, because the DCHRA does not apply on the land where the UAE Embassy is located. (*See* Defs.' Mot. at 23.) In particular, Defendants contend that the property on which the UAE Embassy sits is a federal enclave that is "separate and distinct from the territory of the District of

Columbia" and was established "in the early 1960s," whereas the DCHRA "was enacted in 1977[,]" *i.e.*, "*after* the creation of the federal enclave in which [Youssef] worked[.]" (*Id.* at 23–24.)  In this Court's view, however, Defendants' contention fails to account for at least two critical distinctions between the District of Columbia and the fifty states.  *See ITEL Corp. v. District of Columbia*, 448 A.2d 261, 264 (D.C. 1982) (explaining that "[t]he District of Columbia is treated differently from federal enclaves within state boundaries, such as various military bases[,]" for purposes of the Enclave Clause).

First, and foremost, the District of Columbia is "neither a state nor [a] territory, but a federal enclave" itself.  *Medynski v. Margolis*, 389 F. Supp. 743, 746 (D.D.C. 1975); *see also* U.S. Const. art. I, § 8, cl. 17 (providing that Congress may "exercise exclusive Legislation" over "the Seat of the Government of the United States," *i.e.*, the District of Columbia).  Thus, unlike the relationship between a state and a federal enclave within its boundaries, "*all* parts of the District of Columbia are within exclusive congressional jurisdiction, regardless of whether they are privately- or federally-owned."  *ITEL Corp.*, 448 A.2d at 264 (emphasis in original) (footnote omitted).  Second, it is the Council of the District of Columbia that enacts the District's local laws, and Congress created that body under the District of Columbia Self-Government and Governmental Reorganization Act in 1973.  *See* Pub. L. No. 93-198, 87 Stat. 774 (1973) (codified as amended at D.C. Code § 1-201.01 *et seq.*).  Through that Act, Congress delegated its own legislative authority to the District of Columbia Council for the purpose of enacting local laws in the District, while reserving for itself thirty days to reject any proposed law before the law takes effect.  *See* D.C. Code

§§ 1-201.02(a), 1-204.04(a), 1-206.02(c)(1); *see also ITEL Corp.*, 448 A.2d at 264 n.5. As a result, *all* laws that the District of Columbia Council enacts are "surrogate federal law[,]" *Parker Drilling*, 139 S. Ct. at 1890, insofar as they are expressly "authorized by Congress[,]" *Thomas*, 412 F. Supp. 3d at 75, and the federal enclave doctrine simply does "not apply to exempt federal buildings from D.C. local law[,]" *id.*; *see also id.* (explaining that a contrary result "would surely be at odds with the D.C. Council's [congressionally granted] authority to pass local statutes").

This all means that it is irrelevant whether or not the particular compound on which the UAE Embassy sits should be classified as a federal enclave—which appears to be the nub of the parties' dispute over the applicability of the doctrine (*see* Pl.'s Opp'n at 41; Defs.' Reply at 16)—because, regardless, the federal enclave doctrine does not apply to limit the applicability of D.C. laws with respect to entities located in the District.  And because the federal enclave doctrine is the sole ground on which Defendants challenge the legal sufficiency of Youssef's DCHRA claim (*see* Defs.' Mot. at 23–24), this Court finds that Youssef has stated a plausible claim under the DCHRA.[10]

---

[10] In light of the foregoing discussion, Defendants' additional authorities and arguments regarding the scope of the federal enclave doctrine do not alter this Court's conclusion that the federal enclave doctrine does not preclude Youssef's DCHRA claim.  Consequently, Youssef's motion to strike Defendants' notice of supplemental authority will be **DENIED AS MOOT**.

## IV.    CONCLUSION

As explained above, this Court has subject-matter jurisdiction over Youssef's claims under the FSIA's commercial activity exception, and the federal enclave doctrine does not bar Youssef's DCHRA claim.  Therefore, as set forth in the accompanying Order, Defendants' motion to dismiss will be **DENIED**.


DATE:  August 23, 2021                          *Ketanji Brown Jackson*
                                                KETANJI BROWN JACKSON
                                                United States Circuit Judge
                                                *Sitting by Designation*